UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JONATHAN RODEN,

              Plaintiff                      Case No. 2:16-cv-11208
                                            District Judge Victoria A. Roberts
v.                                    Magistrate Judge Anthony P. Patti

MICHELLE FLOYD, *et al.*,

              Defendants.

_____/

## REPORT AND RECOMMENDATION REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DE 44)

**I.**    **RECOMMENDATION**:  The Court should grant Defendants' motion for summary judgment as to Defendant Beverly Haynes-Love and deny Defendants' motion for summary judgment as to Plaintiff's claims against Defendants Michelle Floyd and Richard Cady.  (DE 44).

**II.**    **REPORT**

      **A.**    **Background**

            **1.**    **Factual Background**

Plaintiff, Jonathan Roden, brings this lawsuit against Defendants Michelle Floyd (Deputy Warden), Richard Cady (Resident Unit Manager), and Beverly Haynes-Love (Corrections Officer), alleging that they transferred him to a more restrictive correctional facility and removed him from Jackson College classes

because of grievances he filed regarding the education program and treatment of

students.  (DEs 1, ¶ 27.)  He brings a retaliation claim under the First and

Fourteenth Amendments to the United States Constitution and seeks compensatory

damages.  (*Id.*, Count I.)

Plaintiff was imprisoned at the G. Robert Cotton Correctional Facility (JCF)

during the events relevant to his complaint.  According to Plaintiff, he was

transferred to JCF in December 2014 in order to attend Jackson College as part of

the "Pathways from Prison to Post-Secondary Education project."  (DE 1 at ¶ 9.)

Through the Prison Education Initiative (PEI), prisoners at JCF could take college

classes through Jackson College and earn credits toward an associate's degree.

(DE 48 at 2; DE 51 at 6-7 (Deposition of K. Rose).)  Prisoners could take classes

via a grant or self-pay for classes.  (DE 51 at 7.)  Plaintiff enrolled in the PEI

program in January 2015, self-paid for his first term of classes, and claims that he

intended to complete the program and graduate in the summer of 2016.  (DE 48 at

2; DE 51 at 7.)   Kevin Rose, the Director of the PEI for Jackson College at JCF,

testified that Plaintiff "was a good student, asked lots of questions. Very engaged.

Always offering to help[,]" and that he believed Plaintiff carried a 4.0 grade point

average.  (DE 51 at 5, 8, 10.)

Plaintiff asserts he attended classes at night and also worked as a GED tutor

during the day.  (DE 1 at ¶ 13.)  Plaintiff was promoted to an academic tutor for

JCF Jackson College students in May 2015.  (*Id.* at ¶ 22.)  Dr. David Clark, one of

Plaintiff's professors, testified that Plaintiff "did a nice job with the students.  He

had a good rapport, students got help from him on a need basis."  (DE 50 at 6

(Deposition of D. Clark).)  During his time as student and tutor, Plaintiff contends

that he advocated for the students in the program, specifically requesting a study

hall in order to "avoid the violence of the prison yard[.]"  (DE 1 at ¶ 15.)  He also

asked that all of the students be housed in the same unit and made complaints

about the "telephones, inner unit study proposal, and improper conduct of unit

staff."  (*Id*. at ¶ 22.)  He filed grievances about these issues in April and May,

2015.  (DE 24 at 16, ¶¶ 1-2.)  He asserts that, in response to those grievances, the

study hall was approved, and additional phones were ordered.  (DE 48 at 3-4; DE

24 at 16, ¶¶ 1-2.)

Plaintiff alleges that on or about June 9, 2015, Defendant Haynes-Love

prevented him from attending one of his marketing classes, claiming that he was

late and could not leave the building.  Plaintiff was issued an "out of place"

misconduct for missing class, and he sent a kite to Defendant Floyd complaining of

"retaliatory acts."  He subsequently filed a grievance against Defendants Floyd and

Haynes-Love and Deputy Warden Artis for preventing him from attending class.

(DE 48 at 4-5; DE 24 at 16, ¶ 4; DE 24 at 26-30.)  Plaintiff asserts that in late June

2015, Defendant Floyd stopped him outside of his class and "checked" him for

3

writing a grievance, and threatened to transfer him, stating **"So you gone [sic] kick the cow that feeds you?"** and **"If you keep kicking the cow that feeds you, you're going to find yourself eating someplace else."** (DE 24 at 16-17, ¶ 5; DE 48 at 5; DE 49 at 11-12 (Deposition of M. Moore).)

A few weeks later, Jackson College held an awards ceremony for Dean's List and Academic Excellence Awards, and Plaintiff was honored by being named to the Dean's List. However, he missed the ceremony because he was "on a visit." (DE 48 at 5.) Plaintiff asserts that the ceremony was attended by the "Jackson College President, Provost, PEI Director, Professors, Wardens, Program Staff, and Education Staff," and that juice and cookies were served as refreshments. (*Id.*; DE 49 at 13; DE 51 at 11-12.) Plaintiff states that the next day, he gave a hand written thank you card to the Classification Clerk to give to Deputy Floyd, which stated "Thank you for your encouragement and support! But you all could have saved me some cookies. Y'all ate <u>all</u> the cookies." (DE 48 at 5 (emphasis in original); DE 44-9 at 6-7; DE 49 at 13-14.)

After receiving the card, on or about July 28, 2015, Defendant Floyd requested that Dr. David Clark, Plaintiff's supervisor, complete a Form 363 report regarding the thank you card incident and request that Plaintiff be terminated from his tutor jobs. (DE 48 at 6; DE 50 at 7-10.) Mr. Clark testified that he completed the Form 363 report, as instructed by Deputy Warden Floyd, and "state[d] the facts

4

as relaid [sic] by Ms. Floyd to [him]." (DE 50 at 10.) Defendant Floyd also

brought the thank you card to the attention of Warden Shawn Brewer, and

requested that Plaintiff be transferred out of JCF. Warden Brewer agreed that

Plaintiff's behavior "presented a security and safety concern and that he could not

remain at JCF." (DEs 44-9 at 3, ¶ 7; 44-11 at 3, ¶¶ 4-5.) Plaintiff claims that

Defendant Floyd then personally emailed the transfer coordinator on July 28, 2015

and instructed that office to transfer Plaintiff, even though he had an education

hold until September 15, 2015, and thus could not be transferred without a

misconduct. (DE 48 at 6.)[1]

On or about August 6, 2015, Plaintiff claims that his school work, consisting

of his Final Exam and English Journal, was improperly confiscated by Officer

Lamb while he was in class working as a tutor, and that when he returned to the

housing unit, he asked Defendant Haynes-Love to call a sergeant about the incident

but she refused. Plaintiff asserts that she instead wrote him "a disobeying a direct

order misconduct for failing to leave the officer's desk, and sent [him] to

segregation." (DE 48 at 7.) He states he was released from segregation the same

night by the sergeant. (*Id.*) After Plaintiff complained, Inspector Roth returned

Plaintiff's materials to him and apologized. (*Id.*; DE 24 at 32, ¶¶ 9-10.) On or

---

[1] Plaintiff refers to and purports to quote from "Floyd, emails 07-28-2015" but does not attach those purported emails as an exhibit, and they do not appear to otherwise be in the record.

about August 11, 2015, Plaintiff submitted a grievance regarding his "improper termination" from his tutor jobs, and on August 13, 2015, Plaintiff submitted a grievance on Officer Lamb for improperly taking his school work.  He states that neither grievance was responded to before he was transferred from JCF.  (DE 48 at 8; DE 24 at 32, ¶¶ 11-12; DE 24 at 35-50.)

At the August 13, 2015 hearing regarding the misconduct ticket written by Defendant Haynes-Love, Plaintiff requested that Defendant Cady recuse himself due to Plaintiff's past grievances against him and Cady's past comment that Haynes-Love was one of his favorites.  According to Plaintiff, Cady denied his request and responded, "As to your grievance[,] who cares, you won't be here long enough to write another grievance, request denied."  (DE 48 at 7-8.)  Plaintiff claims that the grievance coordinator contacted "Classification" and Defendant Floyd on August 13, 2015, to inform them that Plaintiff had submitted another grievance, which "sparked another series of emails in which Floyd reiterated the desire to transfer [Plaintiff]."  (*Id.* at 8.)[2]  Plaintiff claims that Defendant Floyd lied in the email and stated that Plaintiff was no longer enrolled in Jackson College. (*Id.*)  Warden Brewer states that, on August 13, 2015, Correctional Facilities Administration (CFA) Classification Specialist Haynie approved Plaintiff's

---

[2] As above, Plaintiff refers to "Floyd's emails, August 13, 2015" but does not attach those purported emails as an exhibit, and they do not appear to be otherwise in the record.

6

transfer back to his previous facility, Chippewa Correctional Facility (URF).  (DE 44-11 at 3, ¶ 6.)

According to Plaintiff, on August 24, 2015, Defendant Cady instructed ARUS Kik to complete the Security Classification Screen for Plaintiff's transfer. On August 26, 2015, Plaintiff was told he was being transferred, and on August 27, 2015, he was transferred—not to "his previous facility, Chippewa Correctional Facility" as claimed by Warden Brewer, but to Bellamy Creek Correctional Facility (IBC) in Ionia, Michigan.  (DE 48 at 8-9; DE 44-9 at 9; DE 44-11 at 3, ¶ 6.)  While the Transfer Order stated that that transfer was to "[m]ake room for T4C prisoner.  Prisoner is a JC drop" (DE 44-9 at 9), Mr. Rose, the PEI Director for Jackson College at JCF, testified that Plaintiff was not "dropped" from the program until *after* he transferred from JCF, around the first week of September 2015.   (DE 51 at 13-14.)

On August 28, 2015, Plaintiff submitted a grievance alleging retaliatory transfer, JCF-15-09-2308-28C.  (DE 48 at 8-9; DE 44-3 at 14.)  That grievance was rejected at Step 1 for containing "multiple issues," and the rejection was upheld through Step III.  (DE 44-3 at 12-15.)

## B.    Procedural Background

Plaintiff filed his complaint and application to proceed *in forma pauperis* on April 4, 2016 in the Western District of Michigan.  (DE 1.)  The Court granted his

application and transferred the case to this district.  (DE 4.)    On September 14, 2016, once service had been perfected and counsel appeared for all Defendants, they filed their motion for summary judgment.  (DE 19.)  Plaintiff opposed the motion, invoked Federal Rule of Civil Procedure 56(d), and provided an affidavit swearing that he needed discovery, including depositions and interrogatories, in order to respond to Defendants' motion.  (DE 22.)  On May 31, 2017, the Court granted in part Plaintiff's motion to compel, and ordered that Defendants provide certain documents to Plaintiff, free of charge, and supplement a response to an interrogatory. (DE 39.)  That same day, the Court entered a Report and Recommendation to deny Defendants' motion for summary judgment without prejudice to refiling after they have complied with the Court's May 31, 2017 order requiring that they respond to Plaintiff's discovery requests.  (DE 40.)  The Court adopted that report and recommendation on June 29, 2017.  (DE 42.)  On June 29, 2017, Plaintiff filed a notice of compliance with the Court's discovery order, stating that he had received the responsive documents.  (DE 43.)

On July 18, 2017, Defendants filed the instant motion for summary judgment, again alleging that: (1) Plaintiff failed to exhaust his administrative remedies; (2) he did not allege personal involvement of Defendant Haynes-Love in the decision to transfer him; (3) he has not stated a claim for retaliation; and (4) that they are entitled to qualified immunity.  (DE 44.)  The Court entered an Order

on July 19, 2017, requiring Plaintiff to respond to Defendants' motion for summary judgment on or before August 18, 2017.  (DE 45.)  Plaintiff did not file a response to Defendants' motion, but instead filed a motion to strike Defendants' summary judgment motion, contending it was based on "sham affidavits" that include claims that "contradict Defendant Floyd's interrogatory responses."  (DE 46.)  On November 6, 2017, the Court denied Plaintiff's motion to strike and ordered Plaintiff to respond to Defendants' motion for summary judgment by November 30, 2017.  (DE 47.)

Plaintiff filed his response to Defendants' motion for summary judgment on November 27, 2017.  (DE 48.)  In his response, Plaintiff argues that: (1) he has properly exhausted his retaliation claim against Defendants because his grievance was improperly denied as having "multiple issues;" (2) genuine issues of material fact exist as to (a) whether his transfer and loss of college constituted an "adverse action," (b) whether the reasons for his transfer are pretextual, and (c) whether Defendants were deemed decisionmakers regarding the transfer; and (3) Defendants are not entitled to qualified immunity.  (*Id.*)

## B.    Standard

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P.

56(a).  A fact is material if it might affect the outcome of the case under governing

law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The Court

"views the evidence, all facts, and any inferences that may be drawn from the facts

in the light most favorable to the nonmoving party."  *Pure Tech Sys., Inc. v. Mt.*

*Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004) (internal citations omitted).

"The moving party has the initial burden of proving that no genuine issue of

material fact exists . . . ."  *Stansberry v. Air Wis. Airlines Corp.*, 651 F.3d 482, 486

(6th Cir. 2011) (internal quotations omitted); cf. Fed. R. Civ. P. 56 (e)(2)

(providing that if a party "fails to properly address another party's assertion of

fact," then the court may "consider the fact undisputed for the purposes of the

motion.").  "Once the moving party satisfies its burden, 'the burden shifts to the

nonmoving party to set forth specific facts showing a triable issue.'"  *Wrench LLC*

*v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  The nonmoving

party must "make an affirmative showing with proper evidence in order to defeat

the motion."  *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009); *see also*

*Metro. Gov't of Nashville & Davidson Cnty.*, 432 F. App'x 435, 441 (6th Cir.

2011) ("The nonmovant must, however, do more than simply show that there is

some metaphysical doubt as to the material facts . . . .   [T]here must be evidence

upon which a reasonable jury could return a verdict in favor of the non-moving

party to create a genuine dispute.") (internal quotation marks and citations
omitted).

Summary judgment is appropriate if the evidence favoring the nonmoving
party is merely colorable or is not significantly probative. *City Management Corp.
v. United States Chem. Co.*, 43 F.3d 244, 254 (6th Cir. 1994). In other words,
summary judgment is appropriate when "a motion for summary judgment is
properly made and supported and the nonmoving party fails to respond with a
showing sufficient to establish an essential element of its case. . . ." *Stansberry*,
651 F.3d at 486 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

## C.   Discussion

### 1.   Plaintiff Has Exhausted His Retaliation Claims Against Defendants

#### a.   Exhaustion Under the PLRA

Under the PLRA, a prisoner may not bring an action "with respect to prison
conditions under section 1983 of this title, or any other Federal law . . . until such
administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).
Congress enacted this provision to address the "outsized share" of prisoner
litigation filings and to ensure that "the flood of nonmeritorious claims does not
submerge and effectively preclude consideration of the allegations with merit."
*Jones*, 549 U.S. at 203. Put another way, the purpose of § 1997e(a) is to "reduce
the quantity and improve the quality of prisoner suits." *Porter v. Nussle*, 534 U.S.

11

516, 524 (2002).  In addition, exhaustion "gives an agency an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court, and it discourages disregard of [the agency's] procedures." *Woodford v. Ngo*, 548 U.S. 81, 89 (2006) (internal quotation marks and citations omitted).

"There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought into court." *Jones*, 549 U.S. at 211.  The prison's grievance process determines when a prisoner has properly exhausted his or her claim. *Id.* at 218 ("The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion.").  Even where a prisoner has made some attempts to go through the prison's grievance process, "[t]he plain language of the statute makes exhaustion a precondition to filing an action in federal court." *Freeman v. Francis*, 196 F.3d 641, 645 (6th Cir. 1999).  The prisoner "may not exhaust his [or her] administrative remedies during the pendency of the federal suit." *Id.* (citations omitted); *see also Woodford*, 548 U.S. at 95 ("A prisoner who does not want to participate in the prison grievance system will have little incentive to comply with the system's procedural rules unless noncompliance carries a sanction . . . .").  However, "the PLRA and Federal Rule of Civil Procedure 15 permit a plaintiff to

amend his complaint and add claims that were exhausted after the commencement of the lawsuit, provided that the plaintiff's original complaint contained at least one fully exhausted claim." *Mattox v. Edelman*, 851 F.3d 583, 595 (6th Cir. 2017). Moreover, "inmates are not required to specially plead or demonstrate exhaustion in their complaints." *Jones*, 549 U.S. at 216. Instead, failure to exhaust administrative remedies is an affirmative defense under the PLRA. As such, Defendants bear the burden of proof on exhaustion. *Surles v. Andison*, 678 F.3d 452, 456 (6th Cir. 2012) ("A PLRA defendant bears the burden of proving that a PLRA plaintiff has not exhausted his administrative remedies.").

### b. Grievance Procedures at the MDOC

Pursuant to its Policy Directive 03.02.130, dated July, 9, 2007, the administrative remedies available at the MDOC are as follows. First, the inmate must attempt to resolve any issue with the staff member involved within two business days of becoming aware of a grievable issue. (DE 16-2, ¶P.) If the issues are not resolved within five business days, the inmate may file a Step I grievance using the appropriate form. (*Id.*) "Dates, times, places, and names of all those involved in the issue being grieved are to be included." (*Id.* at ¶R.) The inmate should receive a response within fifteen business days of filing the grievance. (*Id.* at ¶X.)

If the inmate is dissatisfied with the disposition of the grievance, or does not receive a response by ten business days after the due date, he or she may file a Step II grievance using the appropriate form.  (*Id.* at ¶ BB.)  As with Step I, a response to the Step II grievance should be issued within fifteen business days.  (*Id.* at ¶CC.)

Similarly, if the inmate is dissatisfied with the Step II response or does not receive a response by ten business days after the response was due, he or she may file a Step III grievance.  (*Id.* at ¶ FF.)  The matter is fully exhausted after the disposition of the Step III grievance.  *Surles*, 678 F.3d at 455 ("A grievant must undertake all steps of the MDOC process for his grievance to be considered fully exhausted.").

### c.    Plaintiff exhausted his administrative remedies as to his retaliation claims against Defendants

Defendants state that Plaintiff filed five Step III grievance appeals while incarcerated at JCF, but that he failed to properly exhaust his administrative remedies as to his Complaint allegations through any of those five grievances. (DE 44 at 18-20, citing DE 44-3.)   Plaintiff responds that he did properly exhaust his administrative remedies against all Defendants in this case through Grievance JCF-15-09-2308-28C.  (DE 48 at 11.)  That grievance, filed on August 28, 2015, alleges "violation of [Plaintiff's] First and Fourteenth Amendment rights … to be free from retaliation (i.e., retaliatory transfer)" by several JCF staff, including all three named Defendants and others, and complains that "[o]n 8-27-15, [Plaintiff]

14

was transferred, in retaliation, to the Bellamy Creek Correctional Facility (IBC).

As a direct and proximate result [he] ha[s] been taken out of the college program

and lost [his] job as a college tutor which clearly constitutes an adverse action."

(DE 44-3 at 14.) The grievance states:

> PD-03.02.130(K) and PD-03.03.130(I)(6), as well as clearly
> established law, sets forth that prison officials may not retaliate
> against a prisoner for engaging in protected conduct.  My grievances
> were protected conduct.  The recent harassment and retaliation by JCF
> staff as documented in my grievance filings during July and August of
> 2015 are also protected conduct.  As a result of these actions I was
> transferred from JCF and removed from the college program.  This
> has caused me to lose paid tuition and to be deprived of the
> opportunity to earn my sought after degree.  Absent my engaging in
> the above-alleged protected activities JCF officials would not have
> transferred me causing my injury.

(*Id.*)  On September 10, 2015, this grievance was rejected at Step I "for containing

multiple issues."  (DE 44-3 at 15.)  Plaintiff asserts that he attempted to file an

appeal of this rejection and made three separate requests for the Step II Appeal

form, but that Grievance Coordinator J. Rohrig "failed/refused to forward the Step

II Appeal form."  (DE 48 at 13.)  Plaintiff then filed a separate grievance on J.

Rohrig, Grievance JCF-15-10-2598-11G, complaining that Rohrig would not

provide the necessary appeal form to appeal Grievance JCF-2015-09-2308-28C.

(DE 48 at 13; DE 44-3 at 9.)  Grievance JCF-15-10-2598-11G was granted in part

in the Step I response on October 25, 2015, providing Plaintiff with the appeal

form and directing Plaintiff to attach a copy of the instant Step I response "for

15

reason of delay" in the Step II appeal of Grievance JCF-2015-09-2308-28C. (DE 44-3 at 10.)

Plaintiff filed his Step II appeal of Grievance JCF-2015-09-2308-28C on November 11, 2015, asserting that it was "improperly rejected … as containing 'multiple issues.'"  (DE 44-3 at 13.)  He stated that "[t]he Step I Grievance itself is premised only on my right 'to be free from retaliation (i.e. retaliatory transfer).'" (*Id.*)  Plaintiff asserts that the Warden, S. Brewer, "failed/refused to timely respond" to the Step II appeal, and that he filed his Step III appeal on December 22, 2015.  (DE 48 at 13-14; DE 44-3 at 13.)  The rejection was upheld at Step III on January 12, 2016.  (DE 44-3 at 12.)

Defendants argue that this grievance does not operate to exhaust Plaintiff's "Complaint allegations" because the grievance was rejected for containing multiple issues in violation of the applicable grievance procedure, citing *Burnett v. Howard*, No. 2:09-cv-37, 2010 WL 1286256, at *1 (W.D. Mich. Mar. 30, 2010) ("As long as the state clearly rejects a grievance for a reason explicitly set forth in the applicable grievance procedure, a subsequent § 1983 claim based on the grievance will be subject to dismissal for failure to properly exhaust.").  (DE 44 at 19-20.) Plaintiff responds that this grievance was "improperly rejected at Step I … because the staff who reviewed, responded, and ultimately rejected the grievance was also a party being grieved in the grievance (J. Rohrig).  The rejection violated Grievance

16

Policy PD 03.03.120U." (DE 48 at 11.) I acknowledge that the MDOC grievance policy does provide that "Prisoners and staff who may be involved in the issue being grieved shall not participate in any capacity in the grievance investigation, review, or response, except as necessary to provide information to the respondent." (DE 44-2 at 5 (MDOC Policy Directive 03.02.130 ¶ U).) However, Plaintiff did not assert this procedural violation in his appeal of the grievance rejection, (See DE 44-3 at 13), and I need not rely on this procedural violation to find that Plaintiff's administrative remedies have been exhausted.

Plaintiff also contends that the "multiple issues rejection" was not valid. (DE 48 at 15.) "[T]he Court is not required to blindly accept the state's application of the procedural rule." *See Reeves v. Salisbury*, No. 11-cv-11830, 2012 WL 3206399, at *5 (E.D. Mich. Jan. 30, 2012), *report and recommendation adopted in pertinent part, rejected on other grounds*, 2012 WL 3151594 (E.D. Mich. Aug. 2, 2012). The MDOC grievance policy provides that a grievance may be rejected if it "contains multiple *unrelated* issues." (DE 44-2 (Policy Directive 03.02.130 ¶ G.1 (emphasis added).) Thus, "a review of federal cases addressing prisoner grievances containing multiple issues reveals that a prisoner 'properly' exhausts where the multiple issues are related or the grievance really involves one claim and multiple harms." *Reeves*, 2015 WL 3206399, at *5 (citing *LaFountain v. Martin*, 334 F. App'x 738, 741 (6th Cir. 2009)). "On the other hand, if the grievance

17

contains two completely unrelated issues, it is not proper." *Id.* (citing *Rusiecki v. Trombley*, 06-cv-14023, 2007 US LEXIS 99733, at \*16 (E.D. Mich. Nov. 30, 2007) (grievance properly rejected because it contained a complaint regarding legal mail and a completely unrelated complaint about a failed monetary disbursement); *Crump v. Caruso*, No. 09-cv-194, 2010 WL 3720068, 2010 US. Dist. LEXIS 97492, at \*9 (W.D. Mich. Sept. 17, 2010) (grievance properly rejected that contained claim regarding lost property, arbitrary punishment, deliberate indifference to medical needs, improper assignment to a smoking unit, and arbitrary refusal to allow the prisoner to see a quartermaster)).

In *LaFountain*, the Sixth Circuit held, as a matter of law, that a grievance that contained complaints about a prisoner being accosted in the bathroom and having his cell robbed did not raise multiple unrelated issues, as concluded by the Step III investigator and the district court, but was really one claim that an MDOC employee retaliated against the prisoner for having filed grievances by labeling him "a snitch and a sexual predator" that resulted in the multiple alleged harms. *LaFountain*, 334 F. App'x at 741 (citing *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999)). Similarly, in *Reeves*, the court concluded that the grievance at issue contained allegations of multiple harms (allegedly false misconduct tickets and allegedly false testimony at the misconduct hearing) stemming from one incident of retaliation for filing a Warden Forum Complaint, not multiple unrelated

issues, as stated by the grievance investigator in rejecting the grievance. *See Reeves*, 2012 WL 3206399, at *6. And in *Griffin v. Berghuis*, No. 11-14876, 2016 WL 1165826 (E.D. Mich. Jan. 3, 2016), *report and recommendation adopted*, 2016 WL 1161503 (E.D. Mich. Mar. 24, 2016), the Court found that "[w]hile there were multiple instances of retaliation alleged [in the grievance], they were all related to the same protected conduct [participation in the Ombudsman investigation]", and thus "there were merely multiple harms alleged as a result of a single claim of retaliation based on plaintiff's participation in the Ombudsman's investigation," and accordingly the plaintiff properly exhausted his administrative remedies.

Applying this case law, I find that Grievance JCF-2015-09-2308-28C does not contain multiple *unrelated* issues; it instead contains multiple harms (being removed from the college program and losing his job as a college tutor) stemming from one incident of alleged retaliation (transfer from JCF in retaliation for filing grievances). Plaintiff appealed this grievance through Steps II and III of the grievance procedure. (DE 44-3 at 12-15.) Accordingly, Plaintiff properly exhausted his administrative remedies.

**2. Defendant Haynes-Love Had No Personal Involvement in the Decision to Transfer Plaintiff and Plaintiff's Claims Against Her Should be Dismissed**

Defendants argue that Plaintiff's claims against Defendant Haynes-Love should be dismissed because she had no personal involvement in the decision to transfer Plaintiff.

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege that: (1) he or she was deprived of a right, privilege, or immunity secured by the federal Constitution and the laws of the United Stated; and, (2) the deprivation was caused by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Flagg Bros. v. Brooks*, 436 U.S. 149, 155-57 (1978). In addition, the complaint must allege each defendant's personal involvement with the alleged violation of federal rights. *See, e.g., Frazier v. Michigan*, 41 F. App'x 762, 764 (6th Cir. 2002) (dismissing claims where complaint did not allege which of the named defendants were personally involved in or responsible for the alleged violation of rights). "Each defendant's liability must be assessed individually based on his own actions." *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010). "*Respondeat superior* or vicarious liability will not attach under § 1983." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989). Instead, liability under § 1983 "must be based on more than … the right to control employees." *Comstock v. McCrary*, 273 F.3d 693, 712-13 (6th Cir. 2002) (internal quotation marks and citation omitted). The doctrine of respondeat superior does not apply to impute liability onto supervisory personnel "unless it is shown that the defendant 'encouraged the

20

specific incident of misconduct or in some other way directly participated in it.'"
*Horton v. Martin*, 137 F. App'x 773, 775 (6th Cir. 2005) (citation omitted).

Defendants argue that Plaintiff's complaint fails to describe with sufficient detail what steps Defendant Haynes-Love took to bring about and approve Plaintiff's transfer.  (DE 44 at 23.)  Consistent with that, Haynes-Love provides sworn testimony that she had no involvement with Plaintiff's transfer and that she did not have the authority to approve Plaintiff's transfer or determine which facility he should be transferred to.  Rather, the JCF Transfer Coordinator was responsible for arranging the proposed transfer and the Central Office Classification (CFA) approved that transfer.  (DE 44-5 at 3, ¶6.)  Plaintiff does not dispute these allegations and in fact does not even address this argument in his response.  Indeed, he only argues that Defendants Floyd and Cady were decisionmakers with respect to his transfer.  (See DE 48 at 17-18.)  Accordingly, the Court agrees that Plaintiff's claims against Defendant Haynes-Love should be **DISMISSED with prejudice** for failure to demonstrate that she had personal involvement with his transfer.

### 3. Plaintiff's Retaliation Claims Against Defendants Floyd and Cady

To assert a claim of retaliation under the First Amendment, Plaintiff must show that: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would "deter a person of ordinary firmness" from

continuing to engage in the conduct; and, (3) there is a causal connection between the elements such that the adverse action was "motivated at least in part by the plaintiff's protected conduct." *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999).

Defendants do not dispute that Plaintiff engaged in protected conduct. Rather, Defendants argue that Plaintiff's retaliation claim should be dismissed because: (1) his transfer to a different correctional facility does not constitute an adverse action; (2) Defendants Floyd and Cady are not decisionmakers with regard to his transfer; and (3) Plaintiff cannot establish a causal connection. (DE 44 at 24-31.) Plaintiff argues in response that genuine issues of material fact exist as to whether his transfer and loss of college constitute an adverse action, whether the reasons for his transfer are pretextual, and whether the defendants were decisionmakers. (DE 48 at 16-25.)

### a.     Adverse Action

"Although the elements of a First Amendment retaliation claim [are] constant, the underlying concepts that they signify will vary with the setting— whether activity is 'protected' or an action is 'adverse' will depend on context." *Bell v. Johnson*, 308 F.3d 594, 602-03 (6th Cir. 2002) (quoting *Thaddeus-X*, 175 F.3d at 388). An action is "adverse" if it 'would deter a person of ordinary firmness from the exercise of the right at stake." *Thaddeus-X*, 175 F.3d at 396.

"[W]hile certain threats or deprivations are so de minimis that they do not rise to the level of being constitutional violations, this threshold is intended to weed out only *inconsequential actions*, and is not a means whereby solely egregious retaliatory acts are allowed to proceed past summary judgment." *Id.* at 398 (emphasis added); *see also Bell*, 308 F.3d at 603 ("Thus, unless the claimed retaliatory action is truly "inconsequential," the plaintiff's claim should go to the jury.").  As a result, "government actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of the constitutional right." *Bell*, 308 F.3d at 603 (quoting *Thaddeus-X*, 175 F.3d at 386).   The adverse action inquiry is ordinarily a question of fact for the jury and "will not be amenable to resolution as a matter of law."  *See Bell*, 308 F.3d at 603; *Thaddeus-X*, 175 F.3d at 398-99.  "The plaintiff's evidentiary burden is merely to establish the factual basis for his claim that the retaliatory acts amounted to more than a de minimis injury." *Bell*, 308 F.3d at 606.  "Once this threshold has been passed, it is up to the trier of tract to determine whether, under the circumstances, the acts were capable of deterring a person of ordinary firmness from engaging in the protected conduct." *Id.*

Defendants argue that Plaintiff's lateral transfer from one correctional facility to another cannot establish an adverse action, relying on *Smith v. Yarrow*,

78 F. App'x 529 (6th Cir. 2003) and *Goss v. Myers*, 2000 U.S. App. LEXIS 1390 (6th Cir. Jan. 28, 2000).  Defendants state that Plaintiff's management and confinement levels remained the same and further argue that Plaintiff's allegation that his transfer resulted in the loss of an opportunity to take college educational courses constitutes *de mimimis* "discomfort that 'prisoners are expected to endure.'"  (DE 44 at 25-26, citing *Hence v. Berghuis*, No. 14-2551 (6th Cir. Feb. 5, 2015) (finding that plaintiff's allegations that the transfer resulted in the loss of property, a vegan diet, a job, and an opportunity to take a certain vocational class constitute *de mimimis* discomforts that prisoners are expected to endure), attached at DE 44-10).

Plaintiff claims in response that this transfer was to a disciplinary facility that did not offer the college programs in which he was enrolled at JCF and that he was placed in a more restrictive unit for sex offenders.  He posits that the transfer caused more than a *de mimimis* injury—the loss of two tutor jobs and the opportunity to participate in the college program and receive a degree—which renders the transfer an adverse action.  He further claims he is now precluded from receiving the federal assistance of the Pell Grant or completing the college program.  (DE 48 at 19-20.)   Plaintiff argues that the circumstances of this case are similar to the facts in *Siggers-El v. Barlow*, 412 F.3d 693, 701-02 (6th Cir. 2005), where the Court found the transfer constituted an adverse action because the

24

transfer resulted in the plaintiff's loss of his high paying job that he needed to pay his attorney and also made it more difficult for his attorney to visit with or represent him. *Id.* at 702. He also asserts that *Sims v. Rewerts*, No. 07-12646, 2009 WL 3617727 (E.D. Mich. Oct. 29, 2009) is similar. In *Sims*, the plaintiff had transferred to JCF for the purpose of entering the Assaultive Offender Program (AOP), and as a participant in that program, he should have had a medical hold on his file prohibiting transfer. *Id.* at *1. The court found that a genuine issue of material fact existed as to whether the plaintiff's transfer from JCF constituted an adverse action because "plaintiff's transfer had 'aggravating factors' with it including the loss of his job and suspension of his AOP, the latter of which jeopardized his eligibility for parole." *Id.* at *2, 9 ("Such factors are not clearly inconsequential and a reasonable trier of fact could conclude that such a retaliatory act would deter a person from exercising his rights").

I find Defendants' assertion—that a prisoner's transfer cannot constitute an adverse action—too narrow. Defendants "focus[] on the wrong constitutional right; i.e., the nonexistent right to avoid segregated housing and prison transfers versus the existing right to avoid retaliation for exercising the First Amendment right to file grievances against prison officials." *See Hill v. Lapin*, 630 F.3d 468, 473 (6th Cir. 2010). It is well settled that "[e]ven though a prisoner has no inherent constitutional right to avoid segregated housing or prisoner transfers, the

25

[MDOC] may not place the prisoner in segregated housing or transfer him to

another prison as a means of retaliating against him for exercising his First

Amendment rights." *See id*.  The Sixth Circuit has further explained:

> Although several unpublished Sixth Circuit cases have held that
> transfers to the general population of another prison are not typically
> an adverse action, *see Smith v. Yarrow*, 78 Fed. App'x 529, 543 (6th
> Cir. 2003) (collecting cases), this court has held in other cases that a
> prison transfer or the threat of a transfer can be an adverse action if
> that transfer would result in foreseeable, negative consequences to the
> particular prisoner.

*Id.* at 474 (citing *Siggers-El v. Barlow*, 412 F.3d 693, 701-02 (6th Cir. 2005);

*Pasley v. Conerly*, 345 F. App'x 981, 985 (6th Cir. 2009)).  Moreover, "actions

that result in more restrictions and fewer privileges for prisoners are considered

adverse." *Id.*

While there are cases that have found that ordinarily a prison transfer, with

no other aggravating factors, does not constitute an adverse action, *see, e.g., Smith*,

78 F. App'x at 543-44 (collecting cases), those case holdings are fact-specific and

generally involve prison transfers with only incidental consequences.  However,

under these facts and circumstances of this case, a reasonable trier of fact could

conclude that the Defendants' transfer of Plaintiff from JCF and his removal from

the Jackson College program were in retaliation for filing grievances, caused

"more than a de minimis injury" and resulted in "more restrictions and fewer

privileges." As such, the actions could deter a prisoner of ordinary firmness from

26

continuing to engage in the protected conduct. Defendants do not contend that the transfer was "routine," and Plaintiff asserts that at the time he was moved to JCF in 2014, an education hold was in place which should have prevented him from being transferred.  Here, as in *Sims,* there were "aggravating factors" beyond the mere transfer from one prison to another.  Plaintiff not only was transferred, but also suffered a number of foreseeable, negative consequences, namely, loss of the ability to continue to participate in the Jackson College program and attend college classes toward an associate's degree and the loss of his two tutor jobs, to say nothing of his allegation that his security level was increased.  "[V]iew[ing] the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to [Plaintiff]," *Pure Tech Sys., Inc.*, 95 F. App'x at 135, I find that Plaintiff has raised a genuine issue of material fact as to whether he suffered an adverse action.

### b.    Decisionmakers

Defendants Haynes-Love and Floyd argue that they did not have the authority to approve Plaintiff's transfer or determine to which facility he should be transferred, and thus they cannot be held liable for retaliation against Plaintiff, relying on *Shehee v. Luttrell*, 199 F.3d 295, 301 (6th Cir. 1999).  (DE 44 at 26-27.) Rather, the JCF Transfer Coordinator would be responsible for arranging the proposed transfer and Central Office Classification (CFA) would approve that

transfer.  (*Id.*)  Plaintiff responds that Defendant Floyd: (1) generated the "termination memo" which "instructed classification" to remove Plaintiff from both tutor jobs; (2) instructed Dr. David Clark to complete the "termination 363" form; (3) emailed the Transfer Coordinator and demanded Plaintiff be transferred despite his education hold, and misrepresented that Plaintiff was no longer enrolled in Jackson College; and (4) submitted an affidavit that Plaintiff's transfer was specifically requested by her in July 2015.  (DE 48 at 18, citing DE 44-9; DE 24 at 31, ¶¶ 1-3.)  In addition, Plaintiff claims that Defendant Cady "instructed ARUS Kik to complete the security screening (CSJ-481) for transfer."  (*Id.*)

First, with respect to Defendant Haynes-Love, I find that this issue has already been addressed in subsection 2 above, where I concluded that Plaintiff's claims against Defendant Haynes-Love should be dismissed with prejudice for failure to allege that she had personal involvement with his transfer.  I further note that Defendants do not argue here that Defendant Cady was not a "decision-maker" with respect to Plaintiff's transfer. (See DE 44 at 26-27.)

But, with respect to Defendant Floyd, I note that the defendant in *Siggers-El v. Barlow*, 412 F.3d at 693 (6th Cir. 2005) made a similar argument to that raised here—that he did not take the adverse action against the plaintiff because he did not transfer the plaintiff, but only completed a security screen, which made the plaintiff eligible for a routine transfer.  *Id.* at 701.  The Court rejected defendant's

28

argument that the transfer cannot be imputed to him, even though the transfer

coordinator must ultimately approve the transfer, because defendant's actions "set

in motion" the plaintiff's transfer. *Id.* Similarly here, it is undisputed that

Defendant Floyd specifically requested Plaintiff's transfer in July 2015, as

admitted in her own affidavit. (DE 44-9 at 3-4, ¶¶ 7, 10; *see also* DE 44-11 at 3, ¶

4 ("Deputy Warden Floyd requested that Roden be transferred out of JCF.").)

Accordingly, the trier of fact could conclude that Floyd's request "set in motion"

Plaintiff's transfer, and the transfer can be attributed to her, even though she did

not have the ultimate authority to complete the transfer.

### c.   Causal connection

The third element that Plaintiff must establish for his retaliation claim to

survive summary judgment is that the adverse action was motivated at least in part

by his protected conduct. *Siggers-El*, 412 F.3d at 699. This element addresses

whether Defendants' subjective motivation for taking the adverse action was at

least in part to retaliate against Plaintiff for engaging in protected conduct.

*Thaddeus-X*, 175 F.3d at 399. If Plaintiff can show that his transfer was at least

partially motivated by his protected conduct, then the burden shifts to Defendants

to show that they would have taken the same action even absent such protected

conduct. *Id.* at 399. At the summary judgment stage, some evidence of retaliatory

motive is required: "[C]onclusory allegations of retaliatory motive unsupported by

material facts will not be sufficient to state a … claim." *Hill*, 630 F.3d at 475

(quoting *Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005)).  However,

circumstantial evidence can suffice.  *Id.*

Defendants argue that Plaintiff has failed to present any evidence

demonstrating that the protected conduct was a factor in the decision to transfer

him to another correctional facility, "[o]ther than his own self-serving

complaint[.]"  (DE 44 at 31.)   They deny that any complaints or grievances by

Plaintiff had any effect on their interactions with him, and state that his "transfer

was the result of his infatuation with JCF female staff members."  (DE 44 at 28,

citing DE 44-9 at 3, ¶ 6.)  Specifically, Defendants assert that Plaintiff made a

"handmade card about cookies" for Defendant Floyd which had "no proper

penological purpose," and that JCF Warden Shawn Brewer agreed that Plaintiff's

card was inappropriate and that he should be transferred because he presented a

security and safety concern at JCF.  (DE 44 at 28; DEs 44-9 at 3, ¶ 6; 44-11 at 3, ¶¶

4-5.)  Defendant Floyd's affidavit also states that Plaintiff was "found in

possession of a love letter which was sexual in nature describing a female teacher

at Jackson College[,]" which purports to be attached as part of Exhibit "A," but

which was not; although an undated memorandum about this is included within the

composite exhibit.  (DE 44-9 at 3, ¶ 6; DE 44-9 at 8.)  However, Defendant Floyd

stated in an interrogatory response that she "*[o]nly*" saw or reviewed "the

inappropriate card that was delivered to [her] office." (DE 32-2 at 4 (emphasis added).)

Defendants posit that "it is without question that [Plaintiff's] sexual fantasies involving a female staff member associated with Jackson College classes required immediate action" and "[t]he logical solution was to remove the threat to safety and security." (DE 44 at 29.) Plaintiff, however, states that the claim that he "was transferred for writing to or sexually fantasizing about Jackson College Staff is a complete fabrication." (DE 48 at 23.) Notably, despite these references to a "love letter" in Plaintiff's possession, "sexual fantasies" and a "logical solution," neither Deputy Warden Floyd's nor Warden Brewer's affidavits identify this as the reason for his actual transfer, both instead respectively linking it to "the card[,]" "because he violated prison rules by sending [Floyd] the card[,]" and "the inappropriateness of the card[.]" (DE 44-9 at 3, ¶¶ 7, 10; DE 44-11 at 3, ¶4.) Further, Director Rose testified that he was not aware of any inappropriate or deviant behavior by Plaintiff towards any of the school staff, but that if there was a such a situation between Plaintiff and school staff, he "[m]ost likely" would have been informed. (DE 51 at 12-13, 16.) Dr. Clark similarly testified that he not "aware of any writings, any letters, any courtings of school staff by [Plaintiff]." (DE 50 at 12.) All of this calls into doubt the veracity of the Defendants' claim regarding the existence of the purported "love letter which was sexual in nature describing a female teacher at

Jackson College," much less that this purported letter "required immediate action" and was a justifiable reason, or even part of the reason, for Plaintiff's transfer.

Plaintiff argues that Defendant's claim that he was transferred for writing and sending a thank you card to Defendant Floyd "is not likely and is 'insufficient to motivate termination [and transfer]'.'"  (DE 48 at 23-26.)  He contends that the thank you card was not improper, but was his way of thanking the Department that made his academic success possible.  He further states that he was not issued any misconduct, notice of intent, hearing or discipline as a result of this card.  Plaintiff contends that if his actions truly "required immediate action," he would not have been permitted to remain in school and working as a tutor for the college in August of 2015, and would have been removed from both positions immediately, but was not.  (DE 48 at 25-26).  Plaintiff further points to sworn affidavit testimony that Defendant Floyd stated to him in July 2015, in response to his writing of grievances, "So you gone [sic] kick the cow that feeds you?" and "If you keep kicking the cow that feeds you, you're going to find yourself eating someplace else."  (DE 48 at 20-21; DE 24 at 16-17, ¶ 5.)  He also cites to corroborating deposition testimony from Martinneze Moore, a prisoner employed as a classification clerk at JCF, who testified that he overheard that conversation with Defendant Floyd, and confirms that Defendant Floyd said "something like that" or "don't bite the hand that feeds you or something like that."  (DE 48 at 21; DE 49 at

10-11.)  Moreover, he states in his response that Defendant Cady was hearing a misconduct report against Plaintiff by Defendant Haynes-Love, and Plaintiff asked Cady to recuse himself because Plaintiff had filed a grievance against Cady in the past and because Cady had allegedly stated that Haynes-Love was his favorite officer.  He reports that Cady replied, "It's none of your business who my favorite is and as for your grievance who cares you won't be here long enough to write another grievance."  (DE 48 at 21.)  Cady denies making this comment, but it remains a disputed question.  (DE 32-4.)

I find that there is an issue of fact as to whether Defendants would have taken the actions to have Plaintiff transferred absent his grievances.  Although recognizing the unique nature of the prison setting and that prison administrators have broad discretion in the administration of prisons, *Turner v. Safley*, 482 U.S. 78, 84-85 (1987), I find that Plaintiff's evidence is sufficient at this stage of the proceedings to raise an issue of fact as to the retaliatory-motive element of Plaintiff's First Amendment claim.  Specifically, there is an issue of fact as to whether Plaintiff's handmade thank you card stating "Thank you! For your encouragement and support!  But you all could have saved me some cookies.  Y'all ate all the cookies" could be deemed inappropriate and to present a security threat requiring an immediate transfer and removal from participation in the college program.  (*See* DE 44-9 at 7-8.)  That Plaintiff did not receive a misconduct, notice

of intent, hearing or discipline as a result of this card further calls into question

whether the card was deemed a security threat requiring immediate transfer.

Plaintiff has also presented testimony regarding statements made by Defendant

Floyd threatening transfer in retaliation for filing grievances. I must construe this

evidence in the light most favorable to Plaintiff. *See Thomas v. Eby*, 481 F.3d 434,

437 (6th Cir. 2007). Further, Plaintiff raises a valid question as to timing: if his

actions regarding the card (and/or his alleged possession of a love letter—which

has not been demonstrated and which neither Deputy Warden Floyd's nor Warden

Brewer's affidavits identify as the reason for his actual transfer) truly presented a

"security and safety concern" (DE 44-9 at 3, ¶ 6), why was he permitted to remain

a tutor for the college for at least several weeks thereafter? (DE 48 at 25-26.)

Finally, the transfer order upon which Defendants rely (DE 44-9 at 9) appears on

its face to be dated July 13, 2016, eleven months after the transfer date (which also

appears on its face), and three months after this lawsuit was filed. Its reliability is

in flux. This and other questions should be resolved by the trier of fact, not the

Court.

### 4. Qualified Immunity

Finally, Defendants assert that they are entitled to qualified immunity with

respect to Plaintiff's claims. However, this argument is largely undeveloped by

Defendants. They merely recite the law regarding qualified immunity but wholly

fail to apply the facts of this case to that law beyond the single, perfunctory statement that "Defendants' actions, as described in Plaintiff's complaint, did not violate clearly established law. Accordingly, Defendants are entitled to qualified immunity." (*See* DE 44 at 31-33.) However, it is well established that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to … put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) (citations omitted); *see also White Oak Prop. Dev., LLC v. Washington Twp.*, 606 F.3d 842, 850 (6th Cir. 2010) ("perfunctory" and "nebulous" argument renders an issue forfeited). In any event, Plaintiff responded to Defendants' motion and argued that "the prohibition on retaliation (transfer) for exercising the First Amendment right to seek redress (write grievances) has been clearly established in the Sixth Circuit, as well as the Eastern District of Michigan for several years," and cited to case law in support of this argument. (DE 48 at 27-28.)

Determining the applicability of qualified immunity requires a two-step inquiry into whether the facts, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established. *Estate of Carter v. City of Detroit*, 408 F.3d 305, 311 (6th Cir. 2005). A plaintiff will defeat a defense

of qualified immunity if he can present sufficient evidence to prove the existence of a genuine issue of material fact regarding the issue of immunity or if the undisputed facts show that the defendant violated his clearly established rights. *Noble v. Schmitt*, 87 F.3d 157, 161 (6th Cir. 1996).

For the reasons stated above, I find that there is a genuine issue of material fact regarding whether Defendants Floyd and Cady violated Plaintiff's First Amendment right against retaliation. Additionally, the prohibition of First Amendment retaliation is clearly established, and a reasonable prison official should know it is illegal to take adverse action against a prisoner in retaliation for filing grievances. *See Siggers-El*, 412 F.3d at 704; *Hill*, 630 F.3d at 474. Qualified immunity is not triggered only where the very action in question was previously held unlawful. *Anderson v. Creighton*, 483 U.S. 635, 639-40 (1987). Rather, the test is whether the contours of the right were sufficiently clear that a reasonable official would understand that what he is doing violated the plaintiff's federal rights. *Id.* The Sixth Circuit has articulated that a reasonable officer should be aware that in certain factual circumstances, a transfer could deter a person of ordinary firmness from engaging in protected conduct. *See, e.g., Siggers-El,* 412 F.3d at 704 (holding defendants were not entitled to qualified immunity because "[a]lthough we held that the transfer in those prior cases would not have deterred a prisoner of ordinary firmness from engaging in protected

36

conduct *under the circumstances present in those cases*, we have noted that a transfer certainly could deter a person of ordinary firmness from engaging in protected conduct.") (emphasis added); *Hill,* 630 F.3d at 474 ("[T]his court has held in other cases that a prison transfer or the threat of a transfer can be an adverse action if that transfer would result in foreseeable, negative consequences to the particular prisoner."); *Short v. Kelly,* No. 13-13246, 2014 WL 4755948, at *9 (E.D. Mich. July 23, 2014) ("Kelly should have reasonably known that his completion of a transfer screen that ultimately resulted in Short's transfer would have the negative consequences of Short losing his allegedly high-status job as a front house porter and his position on the Warden's committee, and is therefore not entitled to qualified immunity on this claim."), *report and recommendation adopted in pertinent part, rejected on other grounds*, 2014 WL 4771924 (E.D. Mich. Sept. 24, 2014). Similarly here, Defendants should have reasonably known that Plaintiff's transfer from JCF would have the negative consequences of him being removed from the Jackson College program, in spite of the education hold in place, and loss of his tutor jobs. Further, Plaintiff contends that he was transferred to a disciplinary facility that did not offer PEI and placed in a more restrictive unit for sex offenders. (DE 48 at 20.) While Defendants claim that the transfer order indicates that Plaintiff was laterally transferred, and that his management and confinement levels remained the same, as discussed *infra*, that transfer order is less

37

than clear (DE 44-9), and it is well-established that actions that "result in more restrictions and fewer privileges for prisoners are considered adverse." *See Hill*, 630 F.3d at 474.   Accordingly, there are genuine issues of material fact regarding Plaintiff's First Amendment retaliation claim and whether Defendants Floyd and Cady should enjoy qualified immunity.

####    D.    Conclusion

For the reasons stated above, the Court should **GRANT** Defendants' motion for summary judgment as to Plaintiff's claims against Defendant Beverly Haynes-Love and **DENY** Defendants' motion for summary judgment as to Plaintiff's claims against Defendants Michelle Floyd and Richard Cady.  (DE 44).

## III.   PROCEDURE ON OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of*

*Teachers Local 231*, 829 F.2d 1370, 1273 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," *etc.*  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich LR 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," *etc.*  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Dated: January 31, 2018            s/Anthony P. Patti
                                   Anthony P. Patti
                                   UNITED STATES MAGISTRATE JUDGE

### Certificate of Service

I hereby certify that a copy of the foregoing document was sent to parties of record on January 31, 2018, electronically and/or by U.S. Mail.

                                   s/Michael Williams
                                   Case Manager for the
                                   Honorable Anthony P. Patti

39